## COURT OF APPEALS.

### Oct., 1912

### THE PEOPLE v. JOHN CAIN.

(206 N. Y. 202.)

MURDER—FACTS, IN TRIAL FOR MURDER, EXAMINED AND HELD THAT QUES-
TIONS OF DEFENDANT'S INSANITY, PREMEDITATION AND DELIBERA-
TION, AND PLEA OF SELF-DEFENSE WERE PROPERLY SUBMITTED TO
THE JURY.

On examination of the facts and the law on appeal by defendant
from a judgment convicting him of murder in the first degree, *held*
that there were no errors committed by the trial court in its ruling
upon admission and rejection of evidence or in its charge. That the
questions of the defendant's insanity, that of premeditation and de-
liberation, and whether, under the circumstances disclosed in this
case, it was necessary self-defense in order to protect himself from
great bodily harm or death, were properly submitted to the jury.

APPEAL from a judgment of the Court of General Sessions
of the Peace in the county of New York, rendered January 26,
1912, upon a verdict convicting the defendant of the crime of
murder in the first degree.

The facts, so far as material, are stated in the opinion.

*Terence J. McManus,* for appellant.

The prosecution utterly failed to sustain the burden of prov-
ing the sanity of the defendant at the time of the commission
of the alleged crime. (Hughes v. Jones, 116 N. Y. 67; Cook v.
Cook, 53 Barb. 180.) The People were required to establish
the sanity of the defendant beyond a reasonable doubt. (People
v. Egnor, 175 N. Y. 419; People v. Ferraro, 161 N. Y. 365;
People v. Silverman, 181 N. Y. 235.)

*Charles S. Whitman,* District Attorney (*Robert C. Taylor* and *Stanley L. Richter,* of counsel), for respondent.

The verdict is conclusive as to the claim of irresponsibility. (People v. Farmer, 194 N. Y. 251.)

HAIGHT, J.:

The indictment charged the defendant with killing one Saxon Serrell with a knife on the 17th day of May, 1911, in the city of New York. He is a negro of a low order of intelligence, about thirty-six years of age, and, in so far as is known, has no living relatives. He came to New York in the year 1898 and was employed in various hotels and apartment houses as bell-boy. On October 19, 1900, he entered a plea of guilty to man-slaughter upon the charge of killing one Richard Bell, in an altercation on Broadway between Thirtieth and Thirty-first streets in the city of New York, and was sentenced to a State prison for a term of fourteen years and three months. While in the State prison at Ossining hallucinations of a persecutory type developed, and he was transferred to the State hospital at Dannemora and there remained until the expiration of his term of imprisonment, when he was discharged. He then returned to New York and engaged in the occupation of a traveling valet or clothes presser, earning good wages, and continued such work until the 17th day of May, 1911. On that day he finished his work about 8.30 in the evening, dined at a restaurant in Fortieth street and then walked over to Sixth avenue and Forty-second street, where he took a north-bound elevated train for his home on West One Hundred and Thirty-third street. He did not enter the car but remained on the rear platform of the second car. He carried an umbrella in one hand and in the other he held an unlighted cigar. Upon the opposite platform stood two white men who spoke to the guard, or the man who tends the platform gates, and asked him how it was that he permitted a

nigger to smoke when he prevented white men from doing so. The guard then turned and looked at the defendant and remarked that he was not smoking, that he was all right, and then continued to give his attention to his business. This question appeared to have annoyed the defendant, and from that time on a conversation was maintained between him and the two white men which the guard was unable to hear by reason of the noise of the train. It, however, appears that one or more blows were exchanged between the white men and the defendant, prior to the train's arrival at the One Hundred and Fourth street station. At that station the white men left the train and in doing so attempted to strike the defendant again. They passed out on to the platform of the station and then called back, stating, in substance, that if he wanted to fight, come on, and they threatened to throw him over the platform. He thereupon drew a knife from his pocket, crowded by the conductor and passed out upon the platform. In the meantime the two white men had run down the stairs and disappeared in the crowd. The defendant then continued on down the stairs, holding the knife in his hand, and as he did so another person blew a police whistle. About the time that he reached the street he called out, " My name is John Cain ; I am some when I get going, and I am going to start," or words to that effect, as appears from the testimony of the witnesses. Shortly after, one Leo J. Hickey, who was then behind him, threw his arm around the defendant, holding his arms tight so that he could not use his knife. About the same time Officer Lawlor came up in front and ordered him to drop his knife, and struck his arm two or three times with a policeman's club. It appears, however, that the last blow fell upon the knuckles of Hickey's hand, causing him to let go of the defendant, who thereupon closed in with Lawlor, and they both fell to the ground. At about that instant a pistol shot was fired, by whom is not disclosed by the record, and thereupon the defendant jumped up and started to run away toward One Hundred

and Fifth street. He claimed to have been hit in the shoulder; but was probably mistaken in this, for it appears that this bullet took effect in another bystander. By that time a large crowd had assembled in the street, and apparently they all joined in the chase, calling out, shoot him, stop him, look out for him, he's got a knife, and various other expressions. Mr. Serrell, the decedent, was in Penn's stationery store writing. Hearing a noise outside he stopped his writing, ran out of the door on to the sidewalk between two show cases that were standing outside upon the walk. He apparently reached the corner of the show cases at about the instant that the defendant was passing on a run, and as he passed he gave Serrell a stab in the chest, which shortly after caused his death. The defendant did not stop but continued on running upon the sidewalk and in the street, apparently wherever he could see an opening in the crowd, stabbing at those who got in his way or attempted to stop him, while many were holloing and some were shooting. As he arrived at One Hundred and Seventh street two bicycle policemen came up and headed him off, and he surrendered to them and threw down his knife. Upon being arrested it was found he had received two bullet wounds, one in the leg and the other in the back between the shoulders. And it is asserted that three of the persons stabbed by him died and that six recovered.

The foregoing is but a brief statement of the facts that transpired on the occasion. The witnesses that were sworn upon the trial all agree as to the main facts, but differ widely in the details and as to the transactions that took place in their view. Of course this necessarily would be the case, for in a large crowd of people constantly changing in their chase of the defendant some would see acts that were not seen by others.

The defense interposed by the defendant's attorney was that of insanity, and that the defendant was laboring under such a defect of reason as to render him irresponsible. He was sworn as a witness in his own behalf, and, in the main, his account

of the various transactions on the occasion corresponded with that of the other witnesses, excepting some variations as to details and some things that he did not remember. It is apparent and conceded by all the witnesses that he was greatly excited, and it may well be that he struck blows in his flight that he did not or could not recall. He, however, testified that he did not see or recognize an officer until he was confronted by the two to whom he finally surrendered at One Hundred and Seventh street. He said that at One Hundred and Fourth street, where he was first seized by Hickey, that under the stairway of the elevated road it was dark and he did not recognize Officer Lawlor, but supposed that he was being pounded by others. He further testified, in substance, that he was running to get away from the crowd and that he stabbed at those who ran in his way and undertook to stop him. He did not know Serrell, but he struck him as he was running by, supposing Serrell had run out of the store to stop him. He also stated that he knew that it was wrong to kill, but that he was attempting to save his own life; that he was frightened and thought that they were going to kill him, and he thought it was right to save himself. The defendant also testified as to his experiences while in Sing Sing and Dannemora prisons. They were, in substance, that he was hearing strange sounds and especially was annoyed at the voice of a person whom he called Harry Rose, who was constantly nagging and irritating him and trying to get him into trouble; that there was some kind of an electrical machine which had wires through the walls of the prison, and that they would burn his head and feet and other parts of his body with the electrical wires, causing him pain and suffering; and that Harry Rose was constantly conspiring to pick trouble with him. These statements were corroborated by the report of the prison officials. He also testified that after leaving the prison he stopped over in Albany, visited the capitol and walked through the streets, and that in doing so people would turn and look at him and then say

that that was John Cain; and that in New York, in passing along the streets, he often heard his name mentioned by the people who passed him, saying that that was John Cain; that the police also all knew him and had called him by name, and that he was a marked man, having done service. He also testified that the last time he heard the voice of Harry Rose on the evening of the 17th of May was while he was on the platform of the car having a conversation with the two meddlesome men, as he expressed it, when the fight started; that while the fight was on he was running too fast and was too much excited at the holloing to hear the voice; that there was just one thing in his mind at that time, and that was "to save himself." The two medical experts who were sworn on behalf of the defendant gave it as their opinion that he was afflicted with paranoia. The three experts sworn for the People pronounced him sane and responsible for his acts.

There were no errors committed by the trial court in its ruling upon admission and rejection of evidence or in its charge to which our attention has been called. The question of the defendant's insanity was doubtless one of fact for the determination of the jury. It is true the defendant had but little time to deliberate and premeditate before striking the blow which deprived Serrell of his life; but that also presented a question of fact. The trial court also submitted to the jury the question as to whether, under the circumstances disclosed in this case, the defendant was justified in doing what he did in order to save his own life, and as to whether it was necessary self-defense in order to protect himself from great bodily harm or death. This also presented a question of fact for the determination of the jury. We are unable, therefore, to find any error that calls for a reversal of the judgment.

The learned district attorney, upon the argument of this case, frankly conceded that the defendant was insane, but contended that he still knew and understood the difference between right

and wrong, that he knew the nature and quality of his acts, that they were liable to produce death, and that it was wrong. He concluded his argument with the statement, " It may be that this unfortunate defendant does not merit the extreme penalty of the law. If so, the executive can safely be trusted to temper justice with mercy. As far as the law itself is concerned, however, the interest of the public demands that its provisions should not be frittered away."

We recognize the fact that the defendant is a dangerous man and ought not to again be permitted to go at large. We are also impressed with the admission of the district attorney, that this man possessed a diseased mind; that while he knew right from wrong and knew the nature and quality of his acts, it is possible that he exaggerated the circumstances that surrounded him when, as he states, he was running to save his life. We should, therefore, under the circumstances of this case, had we the power to do so, commute the sentence of this defendant to imprisonment for life. But this power is vested solely in the executive.

The judgment and conviction should be affirmed.

VANN, J. (dissenting) :

The learned assistant district attorney, with commendable frankness, stated on the argument before us that the defendant was insane when he did the act for the commission of which he has been convicted of the crime of murder in the first degree and sentenced to the punishment of death. With like frankness he suggested that the governor should commute the sentence to a milder punishment, and the prevailing opinion states that the court itself would make such commutation if it had the power to do so. However probable it may be that the executive will act on these suggestions, this does not relieve us of full responsibility for pronouncing a judgment which may result in the infliction of the extreme penalty of the law upon a man ad-

mitted by the prosecution to be insane. Under the circumstances, fairly stated by Judge Haight in his opinion, I think the facts should be further investigated before a final judgment is made, and, hence, I vote for reversal and a new trial.

CULLEN, Ch. J., WERNER, WILLARD, BARTLETT and CHASE, JJ., concur with HAIGHT, J.; VANN, J. reads dissenting memorandum; GRAY, J., absent.

Judgment of conviction affirmed.